**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **SHONDRA L. HAMPTON,** | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **No. 26-cv-02002-TLP-tmp** |
| **TENNESSEE DEPARTMENT OF HUMAN SERVICES, et al.,** | ) | |
| **Defendants.** | ) | |

## REPORT AND RECOMMENDATION

Before the court by order of reference is *pro se* Plaintiff Shondra L. Hampton's Motion for Temporary Restraining Order. (ECF Nos. 4 & 17.) For the following reasons, it is recommended that the motion be denied.

## I. PROPOSED FINDINGS OF FACT

Shondra Hampton, a resident of Memphis, Tennessee, is the owner and operator of Prestigious Learning Academy #1 ("PLA"), a licensed childcare provider serving families and children in Shelby County, Tennessee. (ECF No. 1 at PageID 2.) She brings this civil rights action under 42 U.S.C. § 1983 seeking injunctive and declaratory relief "to prevent the unlawful, retaliatory, and constitutionally deficient shutdown of [PLA], a long-standing childcare provider in Memphis, Tennessee." (ECF No. 1 at PageID

1.) The complaint alleges the Defendants, acting under color of state law, have engaged in retaliatory audits and enforcement actions through the Child Care Certificate Program ("CCCP") and licensing and audit divisions of the Tennessee Department of Human Services ("TDHS") after Hampton participated in protected activity, including reporting misconduct and asserting her legal rights. She sues the TDHS, TDHS Commissioner Clarence Carter, and several TDHS employees in their official capacities. (Id. at PageID

2.) The complaint further alleges:

1. Plaintiff has operated [PLA] for over two decades and has served hundreds of families, including low-income and working families relying on CCCP assistance.

2. Plaintiff has a history of compliance and cooperation with TDHS regulatory requirements.

3. Plaintiff engaged in protected activity, including reporting misconduct, opposing unlawful practices, and asserting her rights under state and federal law.

4. Following this protected activity, TDHS-through its CCCP, audit, and licensing divisions-initiated selective, retaliatory, and excessive audit actions against Plaintiff.

5. Defendants demanded Plaintiff submit to audits outside of normal procedures and threatened program closure for alleged non-compliance tied to retaliatory audit demands.

6. Defendants failed to provide Plaintiff with: a. Adequate notice; b. A meaningful opportunity to be heard; c. Neutral and unbiased decision-makers; and d. Clear standards governing audit selection and enforcement.

7. Plaintiff has raised good-faith concerns regarding potential conflicts of interest and appearance of

impropriety, including undisclosed relationships and affiliations among TDHS decision-makers, necessitating recusal and reassignment to neutral officials.

8. Defendants' actions place Plaintiff's business at immediate risk of closure, threatening irreparable harm to Plaintiff, enrolled children, families, employees, and the community.

(Id. at PageID 2-3.) She alleges violations of her First and Fourteenth Amendment rights. As for the relief sought, Hampton alleges that "[a]bsent immediate injunctive relief, Plaintiff will suffer irreparable harm, including loss of business, reputation, goodwill, staff, and disruption to children and families that cannot be remedied by money damages." (Id. at PageID 4.) Additionally, she seeks injunctive relief prohibiting Defendants from suspending, terminating, or closing PLA and enjoining the Defendants from conducting or enforcing retaliatory audits or CCCP actions. (Id.) Attached to the complaint are over 40 pages of documents, as well as an affidavit from Hampton that mostly mirrors the allegations in her complaint.

After the undersigned granted Hampton *in forma pauperis* status, the undersigned scheduled the motion for an evidentiary hearing. (ECF Nos. 9, 11, 12.) On August 3, 2026, defendant TDHS filed a response in opposition to the motion. (ECF No. 20.) Attached to TDHS's response are declarations from Gwen Laaser, who has worked for TDHS since 2006 and is currently the Director of Child Care Services, Division of Child Care and Community Services.

(ECF No. 20-1 at PageID 92.) Lasser states as follows in her declaration:

> 5. I have been in this role as Director of Child Care Services since 2018.
>
> 6. I am familiar with Shondra Hampton and Prestigious Learning Academy #1 (PLA), located at 399 Gaston Avenue, #1, Memphis, Tennessee 38126.
>
> 7. PLA is a licensed family home with DHS. PLA currently has an active child care license for a maximum of seven children and has a current enrollment of four children.
>
> 8. PLA's most recent continuous license runs from 02/01/26 to 01/31/27.
>
> 9. The most recent visit by DHS licensing staff to PLA was on June 9, 2026, and the licensing staff found that PLA had four children in care at that time.
>
> 10. DHS does not have any open legal enforcement actions with respect to the child care license of PLA.
>
> 11. In September, 2025, DHS received a complaint that PLA was possibly claiming too many children for the child care certificate program, which is a federal grant program under the Child Care and Development Fund Act (42 U.S.C. § 618) that provides money to low income families so that those families can better afford child care. DHS pays these funds directly to child care agencies for the qualifying families.
>
> 12. DHS and PLA had a written agreement whereby PLA would receive reimbursement under the child care certificate program.
>
> 13. Under that written agreement, DHS could conduct on-site audits of PLA at any time to ensure PLA's compliance with the terms of the agreement, per section A.12 of the agreement.

14. Under that same written agreement, PLA agreed to provide information and documents to DHS concerning the child care certificate program upon request by DHS, per sections A.5 and A.6 of the agreement.

15. On October 2, 2025, in order to investigate the complaint regarding PLA about possible overpayments of child care certificate payments, audit monitors from the DHS Office of the Inspector General went to PLA.

16. On October 2, 2025, Shondra Hampton refused to allow the DHS audit monitors into the building of PLA and refused to provide records requested by the audit monitors.

17. Based on PLA's refusal to provide the requested information and documents, DHS sent a termination letter for PLA's participation in the child care certificate program to PLA on December 8, 2025, with an expected termination date of January 8, 2026.

18. DHS did terminate PLA's participation in the child care certificate program on January 8, 2026.

19. Based on a review of the period of June 1, 2024 through March 31, 2025, and based on PLA's refusal to provide documents and information, DHS audit monitors concluded that PLA claimed payments for too many children under the child care certificate program.

20. The amount that PLA may be liable for these overpayments is approximately $86,839.18.

21. DHS, on May 1, 2026, referred PLA to the Tennessee Attorney General's office for collection efforts to recover that amount.

22. PLA's license as a child care agency and licensed family home is in good standing as of the date that I sign this declaration.

(ECF No. 20-1 at PageID 92-94.)

Attached to Laaser's second declaration are (1) the CCCP

agreement between DHS and Shondra Hampton, executed on May 12, 2025; (2) the monitoring report of PLA completed by DHS's Division of Audit Services, dated December 5, 2025;[1] and (3) the letter from DHS to Hampton dated December 8, 2025, notifying Hampton of the termination of the CCCP agreement.[2] (ECF No. 20-2.)

The undersigned conducted a hearing on August 5, 2026, at which time Hampton presented evidence by way of her own testimony; an audio recording she made of a conversation she had with TDHS auditor Teri Nelson on October 1, 2025; an audio/video recording

---

[1]The December 5, 2025 letter informed Hampton that on October 2, 2025, "[Hampton] met the auditors on the sidewalk near the step to the home daycare. [Hampton] stated that we were not welcomed at the center and gave the sign in and sign out sheet for that day. There were several attempts to explain the audit process, however, [Hampton] stated that she was being harassed. There was no documentation provided . . . ." (ECF No. 20-4 at PageID 125.) Under the "Corrective Action" section, Hampton was advised that she must "[c]omplete within fifteen (15) calendar days from the date of this report, a corrective action plan addressing the deficiencies noted in this report." (Id. at PageID 126.) There is no evidence that Hampton ever presented a correction action plan.

[2]The December 8, 2025 letter informed Hampton that, effective January 8, 2026, the TDHS "will terminate the contract with [PLA] for participation in the [CCCP] . . . based on your refusal to comply with the terms specific to clause A.12 Audit and Repayment Requirements by failing to allow TDHS Auditors to access records on October 2, 2025. This termination is in accordance with section D.5 Termination for Convenience." (ECF No. 20-5 at PageID 129.) Section D.5 of the contract between TDHS and Hampton/PLA provides that "*The State may terminate this Contract for convenience without cause and for any reason*. The State shall give the Contractor at least thirty (30) days written notice before the termination date." (ECF No. 20-3 at PageID 104) (emphasis added). Thus, TDHS satisfied the 30-day notice of termination requirement.

of a conversation between Hampton and Nelson on October 2, 2025; and several exhibits.[3] (ECF Nos. 22 & 23.) One of Hampton's exhibits was a printout of a Facebook post she made dated September 18, 2025, in response to a Memphis-area television news station Facebook post titled, "Woman indicted for SNAP fraud, received over $19k in benefits, Miss. officials say." (Injunction H'rg, Ex. 2.) Hampton posted, "The Child Care Program in Memphis needs to be investigated! The ombudsman and friends and close with daycare owners for kickbacks and grant approvals!" (Id.) She later posted, "I'll lead the charge! This s*** ain't getting skipped over. I may need to start tagging folks!! How you get let go from DHS in the form of retirement, but actually let go for sexual harassment. Now you got more daycares and grants for your daycare!! who do you know?!? All your buddy who you use to go out to daycares harassing

[3]Both recordings were played from Hampton's phone at the evidentiary hearing; the recordings themselves could not be admitted because Hampton did not have the recordings saved on a media storage device. The October 1 recording reflects that Nelson spoke with Hampton over the phone and told Hampton that she (Nelson) would be coming to the PLA facility the next day to conduct an audit. In response, Hampton told Nelson that she had to attend her nephew's graduation event on October 2 and asked to reschedule the audit to either Friday, October 3 or another day the following week. The October 2 recording reflects that Nelson met with Hampton outside of the PLA facility. On that occasion, Hampton reiterated that she could not do the audit that day due to the graduation event and asked to reschedule. Hampton also stated that she believed the audit was being done to harass her. Nelson did not conduct the audit on October 2.

the business owners with. You and the childcare certificate folks [] your daycares up, but block parents who want to sign up with my daycare!! The conflict of interest is real deep on this one. . . . If I'm a lie sue me witches!! Picture coming soon." (Id.) Another one of Hampton's exhibits was an email she wrote to Nelson, dated October 6, 2025, in which she stated the attempt to audit her on October 2 was "clear retaliation and a continuation of a long-standing pattern of harassment and reprisal that I have endured for more than 17 years from Mrs. LaRosa Parks and her professional circle inside the [TDHS]. . . . Immediately following [September 18 Facebook] post, Mrs. Parks caused one of her sorority sisters [Nelson] to initiate a surprise audit . . . " (Injunction H'rg, Ex. 3.) Hampton further stated, "Accordingly, I hereby notify you that: I will not participate in or produce records for any audit conducted by you or any DHS employee with a personal or sorority affiliation with Ms. Parks at all. This is harassment. All future audit requests must be made in writing through DHS Legal Counsel or the Office of Inspector General . . . ." (Id.)

Hampton also testified about the harm she would suffer without a preliminary injunction. Her irreparable harm testimony can be summarized as follows:

1. Several years ago, she ran as many as five daycare centers and made over $150,000 a year. After she filed a sexual harassment complaint against her "supervisor" in 2012, her income

began declining and ultimately dropped from $150,000 to $10,000 over a period of ten years.

2. TDHS closed two of her centers in 2012 and 2019.

3. On October 1, 2025, there were seven children attending PLA, but since being terminated from the CCCP, she now only has four children attending PLA.

4. She lost her home in 2016 and has been living in the basement of the PLA facility, her last remaining daycare center, for the past several years.

5. She is $13,000 in debt and has had to borrow money to cover her expenses. The utilities at the daycare center have been turned off because she is behind on her bills.

6. She now only has two employees (down from three), who are likely to lose their jobs soon.

7. Although there are still four children attending PLA, she is not receiving any income for these children because the CCCP benefits no longer cover them.

8. She knows ten families who have been affected by the alleged corruption and that the families of the children who have attended her daycare have told her that they need her daycare center.

TDHS offered no evidence at the hearing and instead relied on the arguments raised in their opposition brief and attached declarations and exhibits.

## II. PROPOSED CONCLUSIONS OF LAW

"Under Federal Rule of Civil Procedure 65, a party may seek injunctive relief if it believes it will suffer irreparable harm or injury during the pendency of the action." DG Smoky, LLC v. Aunt Bug's Cabin Rentals, LLC, No. 3:24-CV-364-TAV-JEM, 2024 WL 4795252, at *7 (E.D. Tenn. Oct. 4, 2024) (citation and internal quotation marks omitted). "'If a defendant is on notice . . . a request for a temporary restraining order may be treated as a motion for a preliminary injunction.'" Id. The standard for issuing a temporary restraining order is the same as the standard for issuing a preliminary injunction. Ne. Ohio Coal. for the Homeless v. Blackwell, 467 F.3d 999, 1009 (6th Cir. 2006).

Generally, a preliminary injunction is issued to "protect plaintiff from irreparable injury and to preserve the court's power to render a meaningful decision after a trial on the merits." Wright & Miller, 11A Fed. Prac. & Proc. Civ. § 2947 (3d ed.). When determining whether to issue a preliminary injunction, courts look to a four-pronged standard: (1) whether the movant has shown a strong likelihood of success on the merits; (2) whether the movant will suffer irreparable harm if the injunction is not issued; (3) whether the issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuing the injunction. Overstreet v. Lexington-Fayette Urban Cty. Gov't, 305 F.3d 566, 573 (6th Cir. 2002) (citing Leary v.

Daeschner, 228 F.3d 729, 736 (6th Cir. 2000)).

The burden is on the moving party to show they are entitled to an injunction. Overstreet, 305 F.3d at 573. "A preliminary injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." Id. (citation omitted). This burden is a "heavy one," Hum. Rts. Def. Ctr. v. Winn, 431 F. Supp. 3d 925, 943 (E.D. Mich. 2020), and "is much more stringent than the proof required to survive a summary judgment motion," Leary v. Daeschner, 228 F.3d 729, 739 (6th Cir. 2000) (citations omitted).

The undersigned finds that the first factor, whether Hampton has shown a strong likelihood of success on the merits, weighs heavily against issuing a preliminary injunction. As to Hampton's First Amendment retaliation claim, she must show:

> (1) [she] engaged in protected conduct; (2) an adverse action was taken against [her] that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by [her] protected conduct.

Bell v. Johnson, 308 F.3d 594, 602 (6th Cir. 2002) (quoting Thaddeus-X v. Blatter, 175 F.3d 378, 394 (6th Cir. 1999) (en banc)). At least at this early stage of the litigation, Hampton has not provided the court with sufficient evidence that would show a strong likelihood of success that TDHS's October 2 audit attempt was motivated at least in part by her September 18 Facebook

post.[4] While the October 1 phone call from Nelson to schedule an October 2 audit came shortly after the Facebook post, there is evidence that there could have been other reasons why an audit was attempted that were unrelated to her post, including a a complaint in September 2025 received by TDHS that PLA was possibly claiming too many children for the CCCP or, as even Hampton suggests, due to "a long-standing pattern of harassment and reprisal that I have endured for more than 17 years from Mrs. LaRosa Parks and her professional circle inside the [TDHS]." As for the decision to terminate PLA from the CCCP, the evidence thus far shows that it was done as a direct result of Hampton's refusal to submit to the October 2 audit, not based on the September 18 Facebook post.

Hampton's Fourteenth Amendment procedural due process and equal protection claims face even greater obstacles. As to procedural due process, Hampton must show: (1) that she was deprived of a protected liberty or property interest; and (2) that the deprivation occurred without adequate procedural protections. Ingraham v. Wright, 430 U.S. 651, 672 (1977); Crosby v. Univ. of Ky., 863 F.3d 545, 552 (6th Cir. 2017). "Property interests are

[4]Hampton makes generalized references to other complaints of misconduct that she has made against TDHS employees in the past. However, unlike the September 18 Facebook post, these other generalized allegations of prior complaints (some of which apparently go back over a decade) lack the factual specificity and temporal proximity to the October 2 audit to plausibly allege a First Amendment retaliation claim.

not created by the Constitution[;] 'they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law.'" Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 538 (1985) (quoting Bd. of Regents v. Roth, 408 U.S. 564, 577 (1972)). "A property interest can be created by a state statute, a formal contract, or a contract implied from the circumstances." Singfield v. Akron Metro. Hous. Auth., 389 F.3d 555, 565 (6th Cir. 2004) (citing Perry v. Sindermann, 408 U.S. 593, 602 (1972)). "Although the underlying substantive interest is created by 'an independent source such as state law,' federal constitutional law determines whether that interest rises to the level of a 'legitimate claim of entitlement' protected by the Due Process Clause." Town of Castle Rock v. Gonzales, 545 U.S. 748, 757 (2005) (citation omitted). The evidence thus far shows that Hampton was not deprived of a protected property interest. She still has her childcare license to operate PLA, and TDHS has neither initiated nor threatened her with any action with respect to her license. As for participation in the CCCP, she was notified by letter that the termination was in accordance with "section D.5 Termination for Convenience," section D.5 authorized TDHS to terminate her CCCP participation "without cause and for any reason" with 30 days written notice, and TDHS satisfied the 30-day notice of termination requirement. As for Hampton's equal protection claim, she contends that she was treated

"differently from similarly situated childcare providers without a rational basis and for retaliatory reasons." "To state an equal protection claim, a plaintiff must adequately plead that the government treated the plaintiff 'disparately as compared to similarly situated persons and that such disparate treatment either burdens a fundamental right, targets a suspect class, or has no rational basis.'" Ctr. for Bio-Ethical Reform, Inc. v. Napolitano, 648 F.3d 365, 379 (6th Cir. 2011) (quoting Club Italia Soccer & Sports Org., Inc. v. Charter Twp. of Shelby, Mich., 470 F.3d 286, 299 (6th Cir. 2006)). Even assuming, *arguendo*, that Hampton could identify comparator childcare providers, there are no fundamental rights or suspect classes at issue, and TDHS has provided a rational basis for the audit (the September 2025 complaint that PLA was possibly claiming too many children) and for terminating her from the CCCP (her refusal to submit to the audit).[5]

The undersigned finds that the irreparable harm factor weighs moderately in favor of issuing a preliminary injunction. Generally, irreparable harm is harm that cannot be remedied with money damages. Certified Restoration Dry Cleaning Network, L.L.C.

[5]Based on the conclusion that Hampton has not shown a strong likelihood of success on the merits as to each of her constitutional claims, the undersigned need not reach TDHS's other arguments relating to this first factor.

v. Tenke Corp., 511 F.3d 535, 550 (6th Cir. 2007). However, irreparable harm may exist if a plaintiff's business is threatened with insolvency or its financial viability is threatened. See Performance Unlimited, Inc. v. Questar Publishers Inc., 52 F.3d 1373, 1382 (6th Cir. 1995). The "impending loss or financial ruin" of a business constitutes irreparable injury. Id. Hampton has presented evidence that although the PLA facility still has its license, without CCCP benefits it is on the verge of closing, affecting not just her own dire financial situation but also impacting the children at the facility and families who need childcare services. Having said that, there is no evidence that the four children currently attending PLA, or the children who no longer attend PLA since termination from CCCP, cannot attend another daycare center should PLA close permanently.

Regarding the third factor, the undersigned finds that there is no evidence that issuance of an injunction would cause substantial harm to others. As for the fourth factor, whether the public interest would be served by issuing the injunction, the evidence weighs both for and against an injunction. On the one hand, the public interest would be served in that the children and their families would benefit from having access to PLA while this lawsuit is pending. On the other hand, TDHS has presented at least some evidence that Hampton may have abused the CCCP and may be liable for overpayments of approximately $86,839.18, in which case

allowing Hampton to have her CCCP benefits reinstated would not serve the public interest.

## III. RECOMMENDATION

Viewing all of these factors together, the undersigned finds that Hampton has not carried her burden of demonstrating that a preliminary injunction is warranted. It is recommended that the motion for preliminary injunction be denied.

Respectfully submitted,

s/ Tu M. Pham
TU M. PHAM
Chief United States Magistrate Judge

August 14, 2026
Date

## NOTICE

**WITHIN FOURTEEN (14) DAYS AFTER BEING SERVED WITH A COPY OF THIS REPORT AND RECOMMENDED DISPOSITION, ANY PARTY MAY SERVE AND FILE SPECIFIC WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS AND RECOMMENDATIONS. ANY PARTY MAY RESPOND TO ANOTHER PARTY'S OBJECTIONS WITHIN FOURTEEN (14) DAYS AFTER BEING SERVED WITH A COPY. 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b)(2); L.R. 72.1(g)(2). FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS MAY CONSTITUTE A WAIVER AND/OR FORFEITURE OF OBJECTIONS, EXCEPTIONS, AND FURTHER APPEAL.**