**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

SHONDRA L. HAMPTON,

Plaintiff,

v.

TENNESSEE DEPARTMENT OF HUMAN SERVICES, et al.,

Defendants.

Case No. 2:26-cv-02002-TLP-tmp

District Judge Parker
Magistrate Judge Pham

RECEIVED
AUG 28 2026
Wendy R Oliver, Clerk
U.S. District Court
W.D. OF TN, Memphis

**PLAINTIFF'S SPECIFIC OBJECTIONS TO REPORT AND RECOMMENDATION (ECF NO. 25)**

Plaintiff Shondra L. Hampton, proceeding pro se, respectfully submits these specific objections to the Report and Recommendation entered August 14, 2026 (ECF No. 25), which recommends denial of Plaintiff's request for preliminary injunctive relief. Plaintiff asks the District Court to conduct de novo review of the portions of the Report and Recommendation identified below under 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure 72(b)(3).

Plaintiff does not object merely because the Magistrate Judge recommended against her. The objections concern specific factual findings and conclusions that, in Plaintiff's view, do not fully account for the evidence presented at the August 5, 2026 hearing, including the recorded October 1 and October 2, 2025 interactions, the timing of the audit, the distinction between refusing an audit and requesting that it be rescheduled, and the evidence of continuing financial and operational harm.

**I. BACKGROUND RELEVANT TO THESE OBJECTIONS**

At the August 5, 2026 evidentiary hearing, Plaintiff testified under oath, played recordings from her telephone, and presented exhibits. The Report and Recommendation itself describes the October 1 recording as reflecting that TDHS auditor Teri Nelson told Plaintiff an audit would occur the next day and that Plaintiff responded that she had a previously scheduled family graduation event and asked that the audit be moved to October 3 or another day the following week. ECF No. 25, PageID 146.

The Report and Recommendation further describes the October 2 recording as reflecting that Plaintiff again told Nelson outside the facility that she could not conduct the audit that day because of the graduation event and again asked to reschedule. The Report states that Plaintiff also expressed her belief that the audit was harassment and that Nelson did not conduct the audit that day. Id.

Nevertheless, the Report later characterizes the termination as resulting from Plaintiff's "refusal to submit to the October 2 audit." ECF No. 25, PageID 150. Plaintiff respectfully objects to treating a request to reschedule as equivalent to a categorical refusal to be audited.

Plaintiff's September 18, 2025 Facebook post criticized the administration of the child care program and called for investigation. The Report recognizes that the October 1 call scheduling the audit occurred shortly after that post. ECF No. 25, PageID 150. Plaintiff contends the temporal sequence, together with the surrounding history and subsequent actions, is relevant to causation at this preliminary stage.

Plaintiff also testified to severe ongoing harm. The Report found that irreparable harm weighs moderately in Plaintiff's favor and acknowledged evidence that PLA is on the verge of closing without CCCP benefits, affecting Plaintiff, children, families, and employees. ECF No. 25, PageID 153-154.

## II. OBJECTION ONE: THE REPORT IMPROPERLY TREATS A REQUEST TO RESCHEDULE THE OCTOBER 2 AUDIT AS A REFUSAL TO SUBMIT TO AN AUDIT

The Report's own factual description of the recordings is materially different from the State's declaration that Plaintiff "refused to allow" auditors into PLA and "refused to provide records." Compare ECF No. 25, PageID 146, with ECF No. 20-1 ¶ 16. According to the Report's description of the actual recordings played at the hearing, Plaintiff asked on October 1 to reschedule because she had a graduation event, proposed October 3 or another day the following week, and repeated that request when Nelson arrived on October 2.

That distinction matters because the State relied on the alleged refusal as the stated reason for termination. The December 8 termination letter cited Plaintiff's alleged failure to allow access to records on October 2. The Report then relied on that same alleged refusal when analyzing First Amendment causation and equal protection.

Plaintiff therefore objects to the finding that the evidence "shows" termination resulted from her refusal to submit to an audit. At minimum, the recordings described by the Court create a material factual dispute over whether Plaintiff refused the audit altogether or requested a short rescheduling.

Plaintiff's October 6, 2025 written objection should be read in context. Plaintiff objected to an audit conducted by persons she believed had conflicts or affiliations connected to her complaints and requested that future audit requests proceed through DHS Legal Counsel or the Office of Inspector General. Plaintiff was challenging the manner and personnel of the audit; she was not abandoning all willingness to provide records to TDHS.

Plaintiff asks the District Court to review the recordings and the October 6 correspondence de novo rather than resolving this factual conflict in favor of the State's declaration.

## III. OBJECTION TWO: THE FIRST AMENDMENT RETALIATION ANALYSIS DOES NOT GIVE SUFFICIENT WEIGHT TO TEMPORAL PROXIMITY AND THE SEQUENCE OF EVENTS

The Report recognizes Plaintiff's September 18, 2025 Facebook post and acknowledges that the October 1 call scheduling the audit came shortly afterward. ECF No. 25, PageID 150. Plaintiff's speech criticized public administration of the child care program and called for investigation.

Plaintiff does not contend that timing alone conclusively proves retaliation. She objects because the likelihood-of-success analysis treated the State's asserted September 2025 complaint and the alleged audit refusal as effectively dispositive without first resolving the factual questions surrounding the complaint, the capacity data that triggered it, and Plaintiff's actual response to the audit.

Plaintiff has now identified a concrete capacity issue that bears directly on the State's asserted rationale. PLA's records reflect a longstanding second shift/extended-care structure, while later DHS system activity generated repeated "over capacity" notices. On November 19, 2025, Licensing Consultant Tatoyra Grady wrote that Plaintiff was allowed "7 children per shift," with "7 kids per 1st shift," "7 kids per 2nd shift," and five additional children that could be placed on either shift or split between them. Plaintiff contends this is inconsistent with treating the program as limited to seven total children.

Plaintiff further states that the licensing problem was not discovered only after the audit. Her correspondence shows licensing/capacity problems existed before and continued through the audit period, and that she repeatedly sought correction. This bears directly on whether the September 2025 "too many children" premise rested on accurate State data.

Plaintiff also has contemporaneous over-capacity notices beginning in 2024 and contemporaneous responses disputing those notices and stating that PLA operated two shifts. This evidence is relevant because the State says a September 2025 complaint about too many children supplied the rational basis for the audit.

Plaintiff respectfully requests that the District Court find that, at this early stage and before discovery into who altered the licensing/capacity record, what capacity number the Certificate Program used, who generated the over-capacity determinations, and who communicated with whom about PLA, the record does not justify treating the State's asserted rationale as conclusively non-retaliatory.

## IV. OBJECTION THREE: THE REPORT DOES NOT FULLY ADDRESS THE LICENSING/CAPACITY ERROR THAT UNDERLIES THE OVER-CAPACITY THEORY

Plaintiff's position is not that TDHS caused every problem affecting PLA. Plaintiff's position is narrower: an error in DHS licensing/capacity information set off a chain of events affecting enrollment, certificate payments, food-program reimbursement, and later over-capacity accusations.

Plaintiff has records showing that her program historically operated with a second shift/extended-care authorization. She also has reevaluation/enrollment materials reflecting a capacity of 12 during the period when the electronic licensing information was allegedly reduced. In addition, the November 19, 2025 Grady email expressly recognizes two shifts and the additional-five allowance.

Plaintiff has produced a PLA child list with handwritten enrollment and departure dates that can be compared child-by-child with each DHS over-capacity notice. Plaintiff asks that the actual enrollment data be compared to the capacity DHS's system was using on each notice date rather than assuming that the over-capacity alerts accurately reflected her authorization.

This issue is particularly important because the State's declaration says the September 2025 complaint involved PLA "possibly claiming too many children," and the State later asserted approximately $86,839.18 in possible overpayments. ECF No. 20-1 ¶¶ 11, 19-20. The accuracy of the underlying capacity and enrollment data therefore goes directly to the State's stated justification.

Discovery has not yet occurred. The Court has not yet received the audit trail showing who changed the licensing record, when it was changed, what fields were altered, what capacity was transmitted to the Certificate Program, or which children DHS counted on each over-capacity date. Plaintiff respectfully submits that those unresolved facts weigh against treating the State's asserted rationale as established for purposes of preliminary relief.

## V. OBJECTION FOUR: THE PROCEDURAL-DUE-PROCESS ANALYSIS IS TOO NARROW IF IT LOOKS ONLY AT THE CONTINUED EXISTENCE OF THE CHILD-CARE LICENSE

The Report concludes that Plaintiff was not deprived of a protected property interest because her child-care license remains active and because the CCCP contract contains a termination-for-convenience clause. ECF No. 25, PageID 152-153. Plaintiff objects to the extent this analysis treats the continued existence of the basic license as resolving all process concerns.

Plaintiff's claimed injury concerns more than physical possession of a license. She alleges that inaccurate capacity information, repeated over-capacity restrictions, removal or denial of certificate children, and termination from the CCCP deprived her program of the practical ability to receive the public reimbursement associated with eligible families.

Plaintiff further contends that the State cited an alleged contractual violation—failure to cooperate with an audit—as the factual basis for termination while simultaneously invoking "termination for convenience." Plaintiff asks the Court to consider whether, where the State expressly relied on alleged misconduct to impose the termination and associated financial consequences, the process actually afforded was constitutionally adequate.
The termination letter itself creates an additional issue. DHS did not simply invoke D.5 without cause. It expressly stated that termination was "based on" Plaintiff's alleged refusal to comply with clause A.12, while also invoking D.5 "Termination for Convenience." ECF No. 20-5, PageID 129. Plaintiff respectfully submits that the Court should not treat the words "for convenience" as ending the constitutional inquiry where the State itself identified a specific cause and where Plaintiff alleges that persons implicated in her prior complaints participated in, influenced, or supplied information leading to the adverse action. The relevant question for the retaliation claim is motive and causation, not merely whether the contract contained discretionary termination language. See Board of County Commissioners v. Umbehr, 518 U.S.

668 (1996) (government contractors retain First Amendment protection against termination motivated by protected speech).

Plaintiff recognizes that the existence of a protected property interest is a legal question and that the termination-for-convenience language presents a significant issue. This objection is preserved for de novo review and for counsel to supplement with any applicable statutory, regulatory, contractual, or CCDBG authority establishing procedural protections beyond the 30-day notice provision.

X. OBJECTION NINE: THE TERMINATION-FOR-CONVENIENCE CLAUSE SHOULD NOT BE TREATED AS IMMUNIZING A RETALIATORY TERMINATION FROM FIRST AMENDMENT REVIEW

The Report relies on D.5, which permits termination "without cause and for any reason" on thirty days' notice. ECF No. 25, PageID 152. But the December 8, 2025 letter did not present the action as an unexplained convenience termination. DHS expressly stated that the termination was "based on" Plaintiff's alleged failure to comply with A.12 by failing to allow access to records on October 2, 2025, and then stated that the termination was being accomplished under D.5. ECF No. 20-5, PageID 129.

That distinction matters to Plaintiff's First Amendment claim. A government entity's contractual discretion does not give it carte blanche to terminate a government contractor in retaliation for protected speech. Board of County Commissioners v. Umbehr, 518 U.S. 668 (1996). Plaintiff therefore asks for de novo review of whether the State's stated A.12 reason was the actual reason, whether the reason was pretextual, and who participated in or influenced the decision. This is especially important where Plaintiff's pre-suit complaints identified officials within the same child-care administration and where the decision chain and internal communications have not yet been produced in discovery.

Plaintiff does not ask the Court to infer wrongdoing merely because an official was named in a complaint. She asks that the involvement, knowledge, communications, and timing of any official who was the subject of prior protected complaints be examined before the State's discretionary termination language is treated as dispositive of motive.

IX. OBJECTION EIGHT: PLAINTIFF'S ATTEMPTS TO USE DHS REVIEW AND APPEAL CHANNELS SHOULD BE CONSIDERED; § 1983 GENERALLY DOES NOT REQUIRE EXHAUSTION OF STATE ADMINISTRATIVE REMEDIES

Plaintiff's position is not that she deliberately bypassed an available State process. Her records reflect repeated efforts to obtain review, appeal, correction, and answers from DHS, including appeal requests concerning the removal/closure of a pre-licensure application, objections to the audit, requests concerning the Certificate Program action, and requests for review of the December 2025/January 2026 actions. Plaintiff states that requests were unanswered, denied verbally, misdirected, or delayed. Those facts are relevant to whether the administrative process provided a meaningful opportunity to be heard before the challenged harm occurred.

In addition, this action was brought under 42 U.S.C. § 1983. The Supreme Court has held that exhaustion of state administrative remedies generally is not a prerequisite to a § 1983 action.

Patsy v. Board of Regents, 457 U.S. 496, 516 (1982). Plaintiff therefore asks counsel and the District Court to distinguish any true jurisdictional issue from an argument that she was required first to obtain relief through DHS's own administrative process.

Plaintiff further asks that the record reflect the practical problem she encountered: when the agency does not respond, does not identify the responsible decision-maker, delays action, or does not provide a meaningful avenue to challenge an adverse action before it takes effect, merely pointing to the existence of an agency process does not establish that Plaintiff actually received meaningful process.

## X. OBJECTION NINE: THE EQUAL-PROTECTION ANALYSIS SHOULD NOT BE RESOLVED AGAINST PLA BEFORE DISCOVERY OF COMPARATORS AND THE DECISION-MAKING RECORD

The Report states that Plaintiff had not identified sufficient comparator evidence and accepted TDHS's asserted rational bases for the audit and termination. ECF No. 25, PageID 152-153. Plaintiff respectfully objects because the information needed to identify similarly situated providers and compare enforcement treatment is largely in the possession of TDHS.

Plaintiff seeks discovery concerning providers with comparable licenses, two-shift/extended-care authorizations, related-child allowances, over-capacity alerts, audits, alleged documentation deficiencies, and CCCP contract issues. Plaintiff also seeks records identifying how DHS handled other providers who requested an audit rescheduling.

Plaintiff does not ask the Court to accept unsupported accusations about other providers as established fact. She asks that the equal-protection claim not be prejudged based on the absence of records she has not yet had an opportunity to obtain through discovery.

## IX. OBJECTION EIGHT: THE IRREPARABLE-HARM FINDING SHOULD BE GIVEN GREATER WEIGHT, INCLUDING THE PARTICULAR HARM TO PLA'S CHILDREN, FAMILIES, AND EMPLOYEES

The Report correctly found that irreparable harm weighs moderately in Plaintiff's favor and recognized that impending financial ruin of a business may constitute irreparable injury. ECF No. 25, PageID 153. Plaintiff respectfully submits that the evidence supports giving this factor substantial weight.

At the hearing, Plaintiff testified that PLA had fallen from seven children to four, that she was receiving no CCCP income for the remaining certificate children, that she had debt and had borrowed funds to keep operating, that utilities had been interrupted, and that two employees faced loss of employment. ECF No. 25, PageID 147-148.

Plaintiff can further document the ongoing harm through prior income records, stock liquidations, credit-card statements, fundraising records, and family loans, including promissory notes for $2,000 and $1,500. One current employee has worked with PLA since 2012 and relies on that employment for a household of five; another employee is a college student who relies on her employment.

The Report noted an absence of evidence that affected children could not attend another daycare. ECF No. 25, PageID 154. Plaintiff respectfully asks permission to supplement the record with parent declarations addressing continuity of care, including evidence from the parent of a nonverbal child who returned to PLA after attempts at other programs and whose parent states that she trusts PLA with the child's care, as well as evidence from Taylor Brown's parent concerning the effect of certificate removal and the parent's desire to return the child to PLA.

Plaintiff submits that these harms are not adequately captured by a later award of money damages if PLA closes, employees lose their jobs, and children permanently lose continuity of care while the case is pending.

X. OBJECTION NINE: THE PUBLIC-INTEREST ANALYSIS SHOULD NOT TREAT THE $86,839.18 FIGURE AS RELIABLE WITHOUT THE UNDERLYING RECORDS

The Report recognized that reinstatement would benefit children and families but also relied on evidence that Plaintiff "may have abused the CCCP" and "may be liable" for approximately $86,839.18 in overpayments. ECF No. 25, PageID 154. Plaintiff objects to giving substantial weight to that figure before the underlying calculation has been tested.

The State's own declaration describes the amount as approximate and states that the audit conclusion was based in part on Plaintiff's alleged refusal to provide documents. ECF No. 20-1 ¶¶ 19-20. Plaintiff disputes the refusal characterization and disputes that she claimed payment for children beyond her lawful capacity.

The newly organized capacity evidence is directly relevant to that calculation. If DHS's system was using an incorrect capacity or had omitted a lawful second shift or related-child allowance, an overpayment calculation built on that capacity could be materially wrong.

Plaintiff asks that the public-interest factor be evaluated on the present evidentiary record without treating the disputed approximate overpayment figure as an established debt or finding of abuse.

XI. REQUEST TO CONSIDER OR PERMIT SUPPLEMENTATION WITH ADDITIONAL EVIDENCE

Under 28 U.S.C. § 636(b)(1) and Rule 72(b)(3), Plaintiff respectfully asks the District Court, in conducting de novo review, to consider the additional evidence identified below or permit Plaintiff to supplement the record in an orderly manner:

1. Historical licenses and licensing records showing the second-shift/extended-care authorization and related notations;

2. The November 19, 2025 email from Licensing Consultant Tatoyra Grady confirming seven children per first shift, seven per second shift, and the additional-five allowance;

3. DHS over-capacity notices from October 2024 forward, together with Plaintiff's contemporaneous responses disputing the capacity determination;

4. PLA's child enrollment list and supporting attendance/enrollment records so the actual child count can be reconstructed on each over-capacity date;

5. Child Care Food Program enrollment-renewal/reevaluation records reflecting "License Capacity: 12," including Plaintiff's handwritten asterisks identifying children she did not recognize as children she personally enrolled;

6. Certificate records for related children, including records concerning Sade Lewis and Ashley Middlebrook, relevant to the additional-five allowance;

7. February 5, 2025 communications concerning Taylor Brown, including the parent's report that Taylor was removed because PLA was considered at capacity, and the later January 2026 termination notice;

8. Plaintiff's November 24, 2025 email to Remell Coleman documenting, before this lawsuit, Plaintiff's complaint that the second shift had been omitted and that the licensing error was affecting enrollment and reimbursement;

9. Financial records documenting ongoing harm, including income records, stock liquidation records, credit-card statements, fundraising records, and family loans/promissory notes;

10. Parent declarations concerning continuity of care and the particular needs of affected children.

Plaintiff further requests discovery of the DHS licensing-system audit trail, including the identity of the person(s) who altered PLA's license/capacity fields, dates and times of changes, before-and-after values, the source of the September 2025 complaint, the capacity data used by the Certificate Program, the children counted for each over-capacity notice, and relevant communications among Licensing, the Child Care Certificate Program, Audit/OIG personnel, and decision-makers concerning PLA.

XII. REQUESTED RELIEF

For the foregoing reasons, Plaintiff respectfully requests that the District Court sustain these objections in whole or in part, decline to adopt the recommendation denying preliminary injunctive relief, and conduct de novo review of the disputed factual and legal issues.

In the alternative, Plaintiff asks the Court to permit supplementation of the preliminary-injunction record with the identified documentary evidence and parent declarations and to reconsider preliminary relief on the supplemented record.

Plaintiff further requests such other and further relief as the Court deems just and proper.

**Respectfully submitted,**

Shondra L. Hampton, Pro Se Plaintiff
399 Gaston Avenue
Memphis, Tennessee 38126
Email: prestigiousla@yahoo.com
Telephone: (901) 649-6356

**CERTIFICATE OF SERVICE**

I certify that on 28th of August, 2026, I served a true and correct copy of the foregoing Plaintiff's Specific Objections to Report and Recommendation on counsel for Defendant(s) by the method permitted by the Federal Rules of Civil Procedure and the Court's electronic filing/service procedures.

Shondra L. Hampton